AMERICAN CONSTITUTIONAL LAW FOUNDATION, INC.; David Aitken; Jon Baraga; Craig C. Eley; Jack Hawkins; Lonnie Haynes; Alden Kautz; Bill Orr, individually and as the Parent and Guardian of William David Orr, Plaintiffs–Appellants,

v.

Natalie MEYER, individually and as Secretary of State for the State of Colorado; Douglas Brown, individually and as Director of Legislative Legal Services for the State of Colorado, Defendants–Appellees.

AMERICAN CONSTITUTIONAL LAW FOUNDATION, INC.; David Aitken; Jon Baraga; Craig C. Eley; Jack Hawkins; Lonnie Haynes; Alden Kautz; William David Orr; Bill Orr, individually and as the Parent and Guardian of William David Orr, Plaintiffs–Appellees,

v.

Natalie MEYER, individually and as Secretary of State for the State of Colorado; Douglas Brown, individually and as Director of Legislative Legal Services for the State of Colorado, Defendants–Appellants.

Nos. 94–1576, 94–1581.

United States Court of Appeals, Tenth Circuit.

July 28, 1997.

Neil D. O'Toole, of Dallas, Holland, & O'Toole, P.C., Denver, CO, for plaintiffs.

Bill Orr, Denver, CO, pro se.

Maurice G. Knaizer, Deputy Attorney General (Gale A. Norton, Attorney General, with him on brief), Denver, CO, for defendants.

Before BRISCOE, SETH *, and LUCERO, Circuit Judges.

---

* The late Honorable Oliver Seth, United States Senior Circuit Judge, heard oral argument in this

BRISCOE, Circuit Judge.

Plaintiffs brought this 42 U.S.C. § 1983 action challenging portions of Senate Bill 93–135, which regulates Colorado's initiative and referendum petition process. Plaintiffs argued S.B. 93–135 imposed restrictions that violated their rights under the First, Ninth, and Fourteenth Amendments to the United States Constitution. Plaintiffs appeal the district court's decision to uphold portions of S.B. 93–135, and defendants appeal the court's decision to strike down portions of S.B. 93–135. We agree with the district court's decision in all regards, except for its ruling upholding the requirement set forth in C.R.S.A. 1–40–112(1) that the circulator be a registered elector. We affirm in part and reverse in part.

## I.

■■■ Colorado allows its citizens to place issues on the ballot by petition. Colo. Const. art. V, § 1(1). The petition process consists of the initiative and the referendum. Colo. Const. art. V, § 1(2) & (3). A referendum is unavailable with respect to laws "necessary for the immediate preservation of the public peace, health, or safety." Colo. Const. art. V, § 1(3). Under the Colorado system, the general assembly has exclusive authority to determine whether a law is "necessary for the immediate preservation of the public peace, health, or safety." *Van Kleeck v. Ramer*, 62 Colo. 4, 156 P. 1108, 1110 (1916). Thus, when the general assembly attaches a "safety clause" to a law, a referendum on the law is precluded, although the right of initiative remains. *See Cavanaugh v. Dept. of Social Services*, 644 P.2d 1, 4 n. 6 (1982).

■■■ The Colorado Constitution grants the general assembly the authority to adopt legislation "designed to prevent fraud, mistake, or other abuses" in the petition process. *Committee for Better Health Care v. Meyer*, 830 P.2d 884, 893 (Colo.1992) (en banc) (citing Colo. Const. art. V, § 1(2), which provides petitions shall be filed "in such form as may be prescribed pursuant to law," and

Colo. Const. art. VII, § 11, which grants general authority to regulate elections and elective franchise). The manner in which petitions may be circulated and by whom, and how they may be signed and by whom are regulated by C.R.S.A. §§ 1–40–101 *et seq.* (West Supp.1996). Senate Bill 93–135 rearranged and amended the article to "properly safeguard, protect, and preserve inviolate" the people's initiative and referendum power. C.R.S.A. § 1–40–101.

Prior to circulation, proponents of a ballot issue must submit a draft petition to the directors of the legislative council and the office of legal services for review and comment. C.R.S.A. § 1–40–105(1). A public hearing is held within two weeks of submission. *Id.* Following the hearing, the draft is presented to the title board, which prepares a title, submission clause, and summary. C.R.S.A. § 1–40–106. The proponents then have six months to file the petition with the Secretary of State. C.R.S.A. 1–40–108(1). Unless the petition contains the number of signatures required by the Colorado Constitution, it is of no effect when filed. C.R.S.A. § 1–40–109(1).

■■■ Petition circulators collect the signatures and sign affidavits in which they aver, among other things, that each signer was a registered elector and was not paid to sign the petition. C.R.S.A. § 1–40–111(2). Circulators assume personal responsibility to prevent irregularities in the process. *Loonan v. Woodley*, 882 P.2d 1380, 1388 (Colo.1994) (en banc). If any circulator is found to have violated any provision of the article, the section of the petition circulated by that person "shall be deemed void." C.R.S.A. § 1–40–132(1).

Plaintiff American Constitutional Law Foundation, Inc., is a non-profit, public-interest organization that supports direct democracy. The remaining plaintiffs are various individuals who, with the exception of William David Orr (a minor who desires to circulate petitions regarding educational vouchers) and Bill Orr (a qualified but unregistered elector), regularly participate in the

case but did not participate in the final decision. The practice of this court permits the remaining two panel judges, if in agreement, to act as a

quorum in resolving the appeal. *United States v. Wiles*, 106 F.3d 1516 (10th Cir.1997).

petition process as proponents and circulators. At the time of trial, Jon Baraga was circulating the Colorado Hemp Initiative and was also the statewide petition coordinator for the Hemp Initiative.

Along with several other plaintiffs, including American Constitutional Law Foundation, Baraga sought to repeal S.B. 93–135 by referendum. Plaintiffs had agreed to devote their resources in a joint effort, but the Secretary of State informed them by letter that a referendum on S.B. 93–135 was precluded because it contained a safety clause.

Plaintiffs brought suit claiming various portions of Article 40 violated the First and Fourteenth Amendments by restricting circulation to six months, requiring all circulators to sign an affidavit, restricting the right to circulate by age and voter registration, requiring all circulators to wear identification badges, requiring proponents to disclose the names of all paid circulators and the amounts they were paid, and attaching a safety clause to S.B. 93–135. They also asserted vagueness and Ninth Amendment claims. The court struck down the badge requirement and portions of the disclosure requirement after concluding they unduly burdened the First and Fourteenth Amendments. The court rejected plaintiffs' remaining claims.

## II.

■ We turn to plaintiffs' First Amendment issues. Plaintiffs argue the manner in which Colorado regulates the petition process is subject to exacting scrutiny because it significantly burdens political speech. They rely heavily on *Meyer v. Grant*, 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988), in which proponents challenged a Colorado law making it unlawful to pay any consideration for the circulation of initiative or referendum petitions. *Meyer* acknowledged "circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Id.* at 421–22, 108 S.Ct. at 1891–92. The Court applied exacting scrutiny to strike down the challenged law, concluding it restricted political expression by limiting the number of voices conveying the proponents' message and making it less like-

ly the proponents would gather the required number of signatures to place their issue on the ballot. *Id.* at 422–23, 108 S.Ct. at 1892–93.

Plaintiffs reason that because S.B. 93–135 restricts the manner in which citizens may circulate petitions, the instant case is indistinguishable from *Meyer*. They also cite *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981), *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), and *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), as controlling authority. Each case, including *Meyer*, involved restrictions on expenditures to disseminate information on political issues. No such restrictions are involved here.

■ A successful petition results in a question being submitted to the voters. Thus, the petition process is a ballot access vehicle, as well as an avenue for political expression. Unlike plaintiffs, we do not read *Meyer* to require that Colorado maintain a petition process that, in essence, allows unregulated access to the ballot. Indeed, such a reading would conflict with the general rule that states have the power to regulate their elections and access to their ballots. *See, e.g., Timmons v. Twin Cities Area New Party*, —— U.S. ——, ——, 117 S.Ct. 1364, 1366, 137 L.Ed.2d 589 (1997) ("States may enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder."); *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974) (recognizing need for substantial regulation of elections if they are to be fair, honest, and orderly). *Cf. Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217, 107 S.Ct. 544, 549, 93 L.Ed.2d 514 (1986) (explaining "the Constitution grants to the States a broad power to prescribe the 'Times, Places, and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices").

"Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elec-

tions." *Burdick v. Takushi,* 504 U.S. 428, 433, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992). The Supreme Court has upheld "generally-applicable and evenhanded restrictions that protect the integrity of the electoral process itself." *Anderson v. Celebrezze,* 460 U.S. 780, 788 n. 9, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983). At least one other circuit has extended similar deference to regulations governing initiative petitions. *See Taxpayers United for Assessment Cuts v. Austin,* 994 F.2d 291, 297 (6th Cir.1993) (applying a more relaxed standard to "nondiscriminatory, content-neutral limitations on the [people's] ability to initiate legislation"); *cf. Biddulph v. Mortham,* 89 F.3d 1491, 1501 n. 10 (11th Cir.1996) (finding balancing of state interest against voter burden used in candidate-access cases not needed in initiative-access cases in upholding state initiative regulations against challenges of non-discriminatory burdensomeness). Colorado has a strong interest in ensuring both candidate elections and ballot issues are run fairly, efficiently, and honestly. *See Timmons,* —— U.S. at ——, 117 S.Ct. at 1367 ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes.").

To subject every petition regulation to exacting scrutiny would tie Colorado's hands in seeking to assure equitable and efficient elections on ballot issues. *Timmons* discussed a flexible standard for evaluating the constitutionality of laws regulating the electoral process:

> When deciding whether a state election law violates First and Fourteenth Amendment associational rights, this Court must weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. Regulations imposing severe burdens must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.

—— U.S. at ——, 117 S.Ct. at 1366 (internal citations omitted). Thus, the rigorousness of our inquiry depends upon the extent to which the challenged law burdens plaintiffs' First and Fourteenth Amendment rights.

Plaintiffs challenge five restrictions—(1) the C.R.S.A. § 1–40–108(1) requirement that proponents file a petition with the secretary of state within six months of the date that the titles, submission clause, and summary have been fixed; (2) the C.R.S.A. § 1–40–111(2) requirement that circulators sign affidavits averring, essentially, that they have complied with Colorado law; (3) the C.R.S.A. § 1–40–112(1) restriction allowing petitions to be circulated only by registered electors at least eighteen years old; (4) the C.R.S.A. § 1–40–112(2) requirement that all circulators wear badges identifying themselves by name and as either paid or volunteer; and (5) the C.R.S.A. § 1–40–112(1) and (2) disclosure requirement regarding paid circulators.

C.R.S.A. § 1–40–108(1) provides, in part, that "[n]o petition for any ballot issue shall be of any effect unless filed with the secretary of state within six months from the date that the title, submission clause, and summary have been fixed and determined." The gist of plaintiffs' argument is that the six-month limit is arbitrary and excludes some measures from being placed on the ballot. Defendants argue the deadline is necessary to preserve an orderly ballot and, in any case, is not as onerous as other limits approved by the Supreme Court, *cf. American Party of Texas v. White,* 415 U.S. 767, 786–87, 94 S.Ct. 1296, 1308–09, 39 L.Ed.2d 744 (1974) (upholding Texas law allowing access to ballot if minor party candidate files petition within 55 days of general primary election).

The six-month deadline is a neutral ballot access regulation. By definition, ballot access restrictions prevent some measures from being placed on the ballot. However, this feature is insufficient by itself to require strict scrutiny. *Cf. Burdick,* 504 U.S. at 433, 112 S.Ct. at 2063 (noting "the mere fact that a State's system 'creates barriers ... tending to limit the field of candidates from which voters might choose ... does not of itself compel close scrutiny' "). The court found,

and the record indicates, that by planning and proper preparation of the ballot, title proponents enjoy ample time to circulate petitions.

■ Although some measures might fare better under a longer or indeterminate period, the current deadline is not a significant burden on the ability of organized proponents to place a measure on the ballot. "[T]he State's asserted regulatory interests [need only be] 'sufficiently weighty to justify the limitation' imposed on the [Plaintiffs'] rights." *Timmons*, —— U.S. at ——, 117 S.Ct. at 1366. Our inquiry does not require "[e]laborate, empirical verification of weightiness" of the State's asserted justifications. *Id.* Defendants assert several interests: preserving the integrity of the state's elections, maintaining an orderly ballot, and limiting voter confusion. The regulation here advances these interests by establishing a reasonable window in which proponents must demonstrate support for their causes. The six-month deadline is a reasonable, nondiscriminatory ballot access regulation; it does not offend the First and Fourteenth Amendments.

■ C.R.S.A. § 1–40–111(2) requires circulators to sign specifically described affidavits and is "generally-applicable" (*Celebrezze*, 460 U.S. at 788 n. 9, 103 S.Ct. at 1570 n. 9). It provides:

> To each petition section shall be attached a signed, notarized, and dated affidavit executed by the registered elector who circulated the petition section, which shall include his or her printed name, the address at which he or she resides, including the street name and number, the city or town, the county, and the date he or she signed the affidavit; that he or she has read and understands the laws governing the circulation of petitions; that he or she was a registered elector at the time the section of the petition was circulated and signed by the listed electors; that he or she circulated the section of the petition; that each signature thereon was affixed in the circulator's presence; that each signa-

ture thereon is the signature of the person whose name it purports to be; that to the best of the circulator's knowledge and belief each of the persons signing the petition section was, at the time of signing, a registered elector; and that he or she has not paid or will not in the future pay and that he or she believes that no other person has paid or will pay, directly or indirectly, any money or other thing of value to any signer for the purpose of inducing or causing such signer to affix his or her signature to the petition. The secretary of state shall not accept for filing any section of a petition that does not have attached thereto the notarized affidavit required by this section. Any signature added to a section of a petition after the affidavit has been executed shall be invalid.

Section 1–40–111(2) is rooted in the Colorado Constitution, which requires circulators to sign affidavits averring that the signatures collected are valid. Colo. Const. art. V, § 1(6). Plaintiffs argue § 1–40–111(2) is unduly burdensome and unconstitutionally vague. We address their vagueness argument in part III of this opinion. There is little, if anything, in the record to support plaintiffs' claim that the affidavit requirement[1] significantly burdens political expression by decreasing the pool of available circulators. Hence, exacting scrutiny is not required.

■ A state has a strong, often compelling, interest in preserving the integrity of its electoral system. *See Timmons*, —— U.S. at ——, 117 S.Ct. at 1366. Circulators play an important role in ballot issue elections—they are solely responsible for gathering the number and type of signatures required to place an issue on the ballot. Indeed, as we have previously noted, circulators are, in effect, entrusted with personal responsibility to prevent irregularities in the petition process. *See Loonan,* 882 P.2d at 1388; *Committee on Better Health Care,* 830 P.2d at 894; C.R.S.A. § 1–40–116(a). The affidavits "ensure that circulators, who possess various degrees of interest in a particular initiative,

---

1. We review here only the requirement that the circulator execute the affidavit. We separately consider and strike down the requirement reflected in the content of the affidavit that the circulator be a registered elector.

exercise special care to prevent mistake, fraud, or abuse in the process of obtaining thousands of signatures of only registered electors throughout the state." *Loonan,* 882 P.2d at 1388–89. Given the responsibility circulators bear in ensuring the integrity of elections involving ballot issues, and given the fact that the affidavit requirement is a reasonable, nondiscriminatory restriction, we conclude plaintiffs' challenge fails.

 Section 1–40–112(1) prescribes who may circulate: "No section of a petition for any initiative or referendum measure shall be circulated by any person who is not a registered elector and at least eighteen years of age at the time the section is circulated." The district court held 1–40–112(1) was unreviewable because the petition process is not a right granted by the United States Constitution. In *Meyer,* we rejected that argument, explaining even though the initiative and referendum process is not guaranteed by the United States Constitution, Colorado's choice to reserve it does not leave the state free to condition its use by impermissible restraints on First Amendment activity. 828 F.2d at 1456. *Cf. Taxpayers United for Assessment Cuts,* 994 F.2d at 295 (concluding although federal Constitution does not require a state to create initiative procedure, if it does, it cannot impose restrictions that violate Constitution); *Henry v. Connolly,* 910 F.2d 1000, 1004 (1st Cir.1990) (same). Furthermore, it is irrelevant that the statutory restriction is based upon a constitutional provision enacted by petition. The voters may no more violate the United States Constitution by enacting a ballot issue than the general assembly may by enacting legislation. *Cf. Citizens Against Rent Control,* 454 U.S. at 295, 102 S.Ct. at 436.

 Plaintiffs argue, essentially, that 1–40–112(1) is discriminatory. Under an equal protection analysis, classifications that impinge upon the exercise of a fundamental right are subject to the most exacting scrutiny. *See, e.g., Clark v. Jeter,* 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988). Plaintiffs do not bring an equal protection claim; nevertheless, when a statute allows some people to speak but not others, the principles of equal protection and free speech are intertwined. Rotunda & Nowak, *Treatise on Constitutional Law: Substance and Procedure 2d* § 20.11, p. 48. *Cf. Police Department of City of Chicago v. Mosley,* 408 U.S. 92, 94–95, 92 S.Ct. 2286, 2289–90, 33 L.Ed.2d 212 (1972).

The registration requirement has a discriminatory effect. It bars persons who are not registered voters from circulating petitions, thereby excluding that group of persons from participating in core political speech. *See Meyer,* 486 U.S. at 421–22, 108 S.Ct. at 1891–92. Colorado acknowledges there are at least 400,000 qualified but unregistered voters in the state. The mandatory exclusion of unregistered circulators also limits the number of voices to convey the proponent's message, limiting the audience the proponents can reach and making it less likely they will be able to gather the required number of signatures to place a measure on the ballot. *Cf. Meyer,* 486 U.S. at 422–23, 108 S.Ct. at 1892–93. Consequently, we apply exacting scrutiny.

 Colorado fails to identify a compelling state interest to which its registration requirement is narrowly tailored. The state attempts to justify the registration requirement by arguing it has a compelling interest in ensuring circulators are residents so the regulatory system may be more easily policed (the secretary's authority to issue subpoenas to circulators does not extend beyond Colorado's borders) and circulators who violate the law may be more easily prosecuted. Even if we assume the state's potentially compelling interest in preserving the integrity of its elections requires all circulators to be residents, a question we need not decide, the registration requirement is not narrowly tailored to ensure that circulators are residents. Clearly, a large number of Colorado residents are not registered voters. The state's asserted interest could be more precisely achieved by simply imposing a residency requirement for circulators. Because Colorado's requirement that circulators be registered voters is not narrowly tailored to a compelling state interest, we find it unconstitutionally impinges on free expression and reverse the district court.

Section 1–40–112(1) also places an age restriction on circulation. We are mindful that "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." *In re Gault*, 387 U.S. 1, 13, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527 (1967). We also recognize, however, that age commonly is used as a proxy for maturity. *See, e.g.*, U.S. Const. art I, § 2, ¶ 2 (establishing age requirement for election to House of Representatives); § 3, ¶ 3 (Senate); art. II, § 1, ¶ 4 (President). *Cf.* U.S. Const. amend. XXVI (extending vote to eighteen-year-olds). Not surprisingly, Colorado places age restrictions on voting and candidacy. Colo. Const. art. 5, § 4 (establishing age requirement for members of General Assembly); art. 7, § 1 (establishing age requirement for voters). While candidacy is not a fundamental right, voting is. *Cf. Burdick*, 504 U.S. at 433, 112 S.Ct. at 2063 (voting); *Bullock v. Carter*, 405 U.S. 134, 142–43, 92 S.Ct. 849, 855–56, 31 L.Ed.2d 92 (1972) (candidacy). Subject to the Twenty-sixth Amendment, it seems states generally may place an age requirement on the right to vote without having to satisfy exacting scrutiny. *Cf. Hill v. Stone*, 421 U.S. 289, 297, 95 S.Ct. 1637, 1642, 44 L.Ed.2d 172 (1975) (examining challenge unrelated to age). Plaintiffs have not demonstrated that persons under eighteen have a stronger interest in circulating than they do in voting. The age requirement is a neutral restriction that imposes only a temporary disability—it does not establish an absolute prohibition but merely postpones the opportunity to circulate. Exacting scrutiny is not required. Because maturity is reasonably related to Colorado's interest in preserving the integrity of ballot issue elections, plaintiffs' First Amendment challenge fails. *Cf. Stiles v. Blunt*, 912 F.2d 260, 267 (8th Cir. 1990) (maturity and life experience significant factors in setting minimum age for candidates), *cert. denied* 499 U.S. 919, 111 S.Ct. 1307, 113 L.Ed.2d 241 (1991).

Section 1–40–112(2) requires each circulator to wear a personal identification badge:

"(a) All circulators who are not to be paid for circulating petitions concerning ballot issues shall display an identification badge that includes the words "VOLUNTEER CIRCULATOR" in bold-faced type which is clearly legible and the circulator's name.

(b) All circulators who are to be paid for circulating petitions concerning ballot issues shall display an identification badge that includes the words "PAID CIRCULATOR" in bold-faced type which is clearly legible, the circulator's name, and the name and telephone number of the individual employing the circulator."

A violation of 1–40–112(2) could result in the signatures collected by a circulator being declared void, C.R.S.A. 1–40–132, and possibly even criminal prosecution, C.R.S.A. 1–40–130(2). The district court held that 1–40–112(2) infringes the right to anonymous political expression and struck it down in its entirety. The court found the badge requirement discourages people from circulating because people are reluctant to wear badges, especially when they advocate unpopular causes.

Defendants attempt to avoid exacting scrutiny. First, they argue the badge requirement has been upheld by the Supreme Court, citing footnotes from *Riley v. National Federation of the Blind of North Carolina*, 487 U.S. 781, 799 n. 11, 108 S.Ct. 2667, 2679, 101 L.Ed.2d 669 (1988), and *Martin v. City of Struthers*, 319 U.S. 141, 148 n. 14, 63 S.Ct. 862, 865, 87 L.Ed. 1313 (1943). *Riley* invalidated a North Carolina law restricting the manner in which professional fundraisers could solicit charitable contributions, and *Martin* invalidated a city ordinance prohibiting knocking on the door or ringing the doorbell of any residence for the purpose of distributing literature. Neither case addressed a law similar to 1–40–112(2) and neither held that a state may condition political expression on the wearing of an identification badge. Further, the footnotes on which defendants rely are dicta. *See, e.g. Riley*, 487 U.S. at 803, 108 S.Ct at 2681 (Scalia, J., concurring) (noting footnote 11 addresses situation not before Court).

Second, defendants argue exacting scrutiny is unwarranted because there is no constitutionally protected right to circulate anonymously. However, "[t]he First

Amendment affords the broadest protection to ... political expression in order '[t]o assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Buckley,* 424 U.S. at 14, 96 S.Ct. at 632 (quoting *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957)). It is also clear that circulation is core political expression. *Meyer,* 486 U.S. at 421–22, 108 S.Ct. at 1891–92. The Supreme Court has protected anonymous political expression and association. *See, e.g., McIntyre v. Ohio Elections Com'n,* 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (invalidating law restricting anonymous election-related hand billing); *Talley v. California,* 362 U.S. 60, 63, 80 S.Ct. 536, 538, 4 L.Ed.2d 559 (1960) (invalidating law prohibiting distribution of "any handbill in any place under any circumstances" unless it contains names and addresses of those who prepared, distributed, or sponsored it); *Bates v. City of Little Rock,* 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960) (striking down ordinance that organization disclose its membership list); *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (overturning civil contempt for failing to disclose membership list). The Court protects anonymity because "fear of reprisal might deter perfectly peaceful discussions of public matters of importance." *Talley,* 362 U.S. at 65, 80 S.Ct. at 539. As the Court has explained, our nation's tradition of anonymous political expression "is perhaps best exemplified by the secret ballot, the hard-won right to vote one's conscience without fear of retaliation." *McIntyre,* 514 U.S. at 342, 115 S.Ct. at 1517.

On the other hand, the Court also has upheld disclosure requirements that deprive some speakers of anonymity. *Buckley,* 424 U.S. at 60–84, 96 S.Ct. at 654–65 (upholding disclosure requirements of Federal Election Campaign Act of 1971). *Cf. First Nat. Bank of Boston,* 435 U.S. at 792 n. 32, 98 S.Ct. at 1424 n. 32 (noting source of corporate political advertising may be required as means of disclosure). Although exhaustive, the disclosures examined in *Buckley* are not akin to the identification badges at issue here. The disclosures in *Buckley* were limited to candidate elections, were triggered only where the

speaker spent money, and were further removed from the moment of speech. Even in *Buckley,* however, the Court acknowledged that "significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest." *Buckley,* 424 U.S. at 64, 96 S.Ct. at 656. Thus, the Court subjected the disclosure requirements to exacting scrutiny. *Id.* at 64–69, 96 S.Ct. at 656–58. To the extent defendants attempt to avoid exacting scrutiny, their second argument is unpersuasive.

Third, defendants argue circulators have only a diminished interest in anonymity because they sign affidavits that are attached to the petition, which is available to the public. *See* § 1–40–118(1). Information contained on an identification badge is much more accessible than information attached to a filed petition and, unlike the affidavit requirement, the badge requirement forces circulators to reveal their identities at the same time they deliver their political message. The badge requirement operates when the reaction to their message may be the most intense, emotional, and unreasoned. Thus, as opposed to the affidavit requirement, the badge requirement deprives circulators of their anonymity at the precise moment their interest in anonymity is greatest. The record amply supports the court's finding that the badge requirement chills circulation. It places a "severe" restriction on First and Fourteenth Amendment rights requiring exacting scrutiny.

 Defendants argue the badge requirement serves a compelling interest, aiding the state's efforts to prevent fraud by enabling the public to identify individuals who make false or fraudulent statements while circulating. Thus, defendants essentially argue the badges enable the state to pursue more efficiently individuals who engage in misconduct. Although the state has a compelling interest in preserving the integrity of its elections (*see, e.g., Eu v. San Francisco Democratic Com.,* 489 U.S. 214, 231, 109 S.Ct. 1013, 1024, 103 L.Ed.2d 271 (1989)), "the First Amendment does not permit the State to sacrifice speech for efficien-

cy" (*Riley,* 487 U.S. at 795, 108 S.Ct. at 2676). Additionally, "the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting." *Meyer,* 486 U.S. at 427, 108 S.Ct. at 1894. Therefore, "[a]lthough the State has every right to take strong measures to prevent ... dishonest activities by petition circulators, the State may do so only by measures tailored to attack those problems within clearly recognized areas permitted by the Supreme Court." *Grant,* 828 F.2d at 1454.

Ohio claimed the same general interest in identifying individual instances of misconduct in *McIntyre,* 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426. In *McIntyre,* the petitioner challenged an Ohio law prohibiting, among other things, distribution of any publication designed to promote the adoption or defeat of a ballot issue unless the publication contained the name of the person who was responsible for it. The purpose of the law was to identify persons who distributed materials containing false statements. The Court applied exacting scrutiny and invalidated the law because it was not narrowly tailored to serve Ohio's asserted interest in preventing fraud.

Circulating a petition is akin to distributing a handbill. In both instances, an individual identifies himself or herself with a specific viewpoint by personally disseminating it. Just as those who distribute handbills have a strong interest in remaining anonymous, so do circulators. As the Supreme Court has explained:

> Anonymity is a shield from the tyranny of the majority. It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation— and their ideas from suppression—at the hand of an intolerant society. The right to remain anonymous may be abused when it shields fraudulent conduct. But political speech by its nature will sometimes have unpalatable consequences, and, in general, our society accords greater weight to the value of free speech than to the dangers of its misuse.

*McIntyre,* 514 U.S. at 356, 115 S.Ct. at 1524 (internal citation omitted).

Defendants argue the badge requirement is the type of "limited identification requirement" *McIntyre* suggested might be constitutional. Defendants rely on *Buckley,* which upheld compelled disclosure of certain expenditures and their uses in candidate elections. Requiring circulators to identify themselves against their will is more intrusive than simply disclosing an expenditure. Whereas contributing to a campaign is only a generalized demonstration of support, circulating a petition, and the advocacy it entails, more clearly identifies the circulator with the precisely defined point of view he or she is personally encouraging others to support. Spending money to advance an unpopular viewpoint is a more detached form of support and is less likely to precipitate retaliation than circulating a petition. *Cf. McIntyre,* 514 U.S. at 354, 115 S.Ct. at 1523 (distinguishing expenditure from distributing handbill).

As previously noted, defendants argue the badge requirement is necessary to enable the state to identify and punish fraud. Section 1–40–112(2) is not narrowly tailored to serve the state's asserted interest. Conditioning circulation upon wearing an identification badge is a broad intrusion, discouraging truthful, accurate speech by those unwilling to wear a badge, and applying regardless of the character or strength of an individual's interest in anonymity. Additionally, the badges are but one part of the state's comprehensive scheme to combat circulation fraud. Article 40 provides other tools that are much more narrowly tailored to serve the state's interest. *See* C.R.S.A. §§ 1–40–130, 1–40–131 (criminalizing certain conduct); 1–40–132 (authorizing secretary of state to void a petition). *See also* C.R.S.A. §§ 1–40–110 (requiring every page to contain a warning to potential signers); 1–40–118 (providing for written protest). Although requiring circulators to wear identification badges may enhance the state's ability to impose other penalties, it does not follow, and it is unestablished, that the badges are a necessary component of the state's arsenal. *Cf. Burson v. Freeman,* 504 U.S. 191, 199, 112 S.Ct. 1846, 1851, 119 L.Ed.2d 5 (1992) (explaining that "[t]o survive strict scrutiny ... a State

must do more than assert a compelling state interest—it must demonstrate that its law is necessary to serve the asserted interest").

Because we find the badge requirement unconstitutionally infringes on circulators' First Amendment rights by its identification requirements, and because plaintiffs' arguments and evidence focus entirely on this element of the badge requirement, we express no opinion regarding whether the additional requirements that the badge disclose whether the circulator is paid or a volunteer, and if paid, by whom, would pass constitutional muster standing alone.

 Section 1–40–121 places disclosure requirements on paid circulators and is "generally-applicable" (*Celebrezze*, 460 U.S. at 788 n. 9, 103 S.Ct. at 1570 n. 9). It provides as follows:

(1) The proponents of the petition shall file with the official who receives filings under the "Campaign Reform Act of 1974", article 45 of this title, for the election the name, address, and county of voter registration of all circulators who were paid to circulate any section of the petition, the amount paid per signature, and the total amount paid to each circulator. The filing shall be made at the same time the petition is filed with the secretary of state. Any payment made to circulators is an expenditure under article 45 of this title.

(2) The proponents of the petition shall sign and file monthly reports with the secretary of state, due ten days after the last day of each month in which petitions are circulated on behalf of the proponents by paid circulators. Monthly reports shall set forth the following:

(a) The names of the proponents;

(b) The name and the residential and business addresses of each of the paid circulators;

(c) The name of the proposed ballot measure for which petitions are being circulated by paid circulators; and

(d) The amount of money paid and owed to each paid circulator for petition circulation during the month in question.

The court invalidated 1–40–121(1) to the extent it requires the proponents of a petition to provide "the name, address, and county of voter registration of all circulators who were paid to circulate any section of the petition" in reporting the amounts paid to circulators. The court invalidated 1–40–121(2) in its entirety. We apply exacting scrutiny. *See Buckley*, 424 U.S. at 64, 96 S.Ct. at 656.

Section 1–40–121 is a broad disclosure provision. It compels disclosure of the name of a paid circulator regardless of the amount he or she received to circulate. The State analogizes 1–40–121 to the Federal Election Campaign Act of 1971 disclosure provision upheld in *Buckley*. *Buckley* acknowledged that "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Id.* at 64, 96 S.Ct. at 656. However, *Buckley* identified three interests "sufficiently important to outweigh" the infringement on the "privacy of association and belief guaranteed by the First Amendment." *Id.* at 64, 96 S.Ct. at 656. First, campaign finance disclosure informs voters of the candidate's place in the political spectrum and alerts them "to the interests to which a candidate is most likely to be responsive." *Id.* at 67, 96 S.Ct. at 657. Second, "disclosure requirements deter actual corruption and avoid the appearance of corruption." *Id.* Third, "disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations." *Id.* at 68, 96 S.Ct. at 658.

Unlike the statute in *Buckley*, 1–40–121 imposes no monetary threshold—a circulator must be identified by name and address regardless of whether he or she received 10 cents or $10,000. *Cf. Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87, 93, 103 S.Ct. 416, 420, 74 L.Ed.2d 250 (1982). The statutes at issue in *Buckley* and *Brown* are dissimilar from 1–40–121 for another reason—they regulate candidate elections but 1–40–121 does not. *Cf. Brown*, 459 U.S. at 89 n. 2, 103 S.Ct. at 419 n. 2 *and Buckley*, 424 U.S. at 63, 96 S.Ct. at 655 *with* C.R.S.A § 1–40–121. Section 1–40–121 applies only to the circulation of initiative and referendum petitions. None of the three interests the Court found sufficient in *Buckley* are relevant here. The first and third

are inapplicable because 1–40–121 addresses expenditures, not contributions. The second is inapplicable because "quid pro quo" concerns are not present here. *Cf. Bellotti*, 435 U.S. at 790, 98 S.Ct. at 1423 (explaining "[r]eferenda are held on issues, not on candidates for public office. The risk of corruption perceived in cases involving candidate elections ... simply is not present in a popular vote on a public issue."). Defendants' attempts to analogize 1–40–121 to *Buckley* are unpersuasive.

Defendants argue 1–40–121 survives even exacting scrutiny because it is necessary to enable signers to determine whether there is "grassroots" support for a measure and to discourage fraud. Neither 1–40–121(1) nor 1–40–121(2) is narrowly tailored to serve these interests.

The court struck down 1–40–121(1) to the extent it compels disclosure of information specific to each paid circulator. Much like requiring identification badges, compelling the disclosure of the identities of every paid circulator chills paid circulation, a constitutionally protected exercise. Although the fact that disclosure is made at the time the proponents file the petition lessens the burden of the disclosure, the law fails exacting scrutiny because the interests asserted by the state either already are or can be protected by less intrusive measures. *Cf. Grant*, 828 F.2d at 1452 (Colorado's ban on paid circulators failed exacting scrutiny because interests Colorado asserted either were or could be protected by less intrusive measures).

Defendants' first asserted interest, informing the electorate whether a measure has grassroots support, is directly and specifically protected by the constitutional requirement that to reach the ballot an initiative or referendum petition must be signed "by registered electors in an amount equal to at least five percent of the total number of votes cast for all candidates for the office of secretary of state at the previous general election." Colo. Const. art. V, § 1(2) & (3); C.R.S.A. § 1–40–109(1). As limited by the court, 1–40–121(1) requires proponents to disclose the amount spent per signature and, thus, the total amount paid to circulators.

To the extent the amount of money spent has some correlation to the level of grassroots support, this information allows voters to compare the level of support enjoyed by different issues. Requiring proponents to provide a detailed roster of all who were paid to circulate compromises the expressive rights of paid circulators, but sheds little light on the relative merit of the ballot issue.

Defendants' second asserted interest, discouraging fraud, also is protected by a battery of more narrowly tailored measures. *See* C.R.S.A. §§ 1–40–130, –131 (criminalizing certain misconduct during circulation); 1–40–132 (authorizing secretary of state to void petition). *See also* C.R.S.A. § 1–40–110 (requiring every page to contain warning to potential signers); § 1–40–118 (providing for written protest). The State has made no showing that these mechanisms are inadequate. *Cf. Colorado Republican Federal Campaign Committee v. Federal Election Com'n*, — U.S. —, —, 116 S.Ct. 2309, 2317, 135 L.Ed.2d 795 (1996). Defendants have not shown the disclosure is necessary to discourage fraud.

Section 1–40–121(2) compels detailed monthly disclosures. The court invalidated it in its entirety. Defendants assert the same two interests: grassroots support and fraud. Compelling detailed monthly disclosures while the petition is being circulated chills speech by forcing paid circulators to surrender the anonymity enjoyed by their volunteer counterparts. In that the disclosures are contemporaneous with circulation, 1–40–121(2) is more akin to the badge requirement than 1–40–121(1). Section 1–40–121(2) is a broad intrusion only loosely related to the interests it is purported to serve. Like 121(1), 121(2) fails exacting scrutiny because it is not narrowly tailored to serve either of defendants' asserted interests.

### III.

Plaintiffs argue 1–40–111(2), which requires circulators to sign specifically described affidavits, is unconstitutionally vague. Failure to comply with 1–40–111(2) may result in criminal prosecution. C.R.S.A. § 1–40–130(1). Plaintiffs' opening brief on

appeal addresses only the chilling effect resulting from the threat of criminal prosecution. Their reply brief, however, expands the discussion to include the civil penalty set forth in 1–40–132(1). Because their opening brief did not address the civil penalty, and because this argument does not appear to have been before the district court, we will not consider it.

In *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972), the Court explained, generally, as follows:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut(s) upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of (those) freedoms." Uncertain meanings inevitably lead citizens to "steer far wider of the unlawful zone" ... than if the boundaries of the forbidden areas were clearly marked.

Plaintiffs argue, essentially, that 1–40–111(2) is so difficult to understand that it inhibits circulation and, therefore, abuts upon political expression. They specifically attack the requirement that circulators "read and understand" the law governing circulation.

■ We must read the statute as it has been interpreted by Colorado's highest court. *United States v. Gaudreau,* 860 F.2d 357, 361 (10th Cir.1988). In *Loonan v. Woodley,* 882 P.2d 1380 (Colo.1994) (en banc), the Colorado Supreme Court considered and rejected a vagueness challenge directed at the "read and understand" requirement. Plaintiffs argued, in part, that the requirement was vague because lay circulators had no way to determine whether their "understanding" was legally sufficient. *Loonan* dismissed their argument, explaining as follows:

> Under the statute, a circulator may be penalized only for signing the affidavit without "reasonably believing that the statements made in the affidavit are true." § 1–40–130(1)(d). Understanding [the law governing circulation] ... requires nothing more than that a circulator believe that he or she knows what a circulator can and cannot do. This prohibition would ensnare only those circulators who made no attempt to understand their duties. The "read and understand" language mandated in the circulator's affidavit accordingly provides fair notice of the prohibition because it accommodates the subjective belief of the circulator.

882 P.2d at 1390.

■ The vagueness doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1857, 75 L.Ed.2d 903 (1983). We are mindful of the special concerns that attach when a criminal law is alleged to impinge upon a First Amendment right. *See, e.g., NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963); *Gaudreau,* 860 F.2d at 360. Nevertheless, in light of *Loonan,* we conclude the statute is sufficiently definite because it "explicitly endorses the lay circulator's own interpretation of 'understanding,'" *Loonan,* 882 P.2d at 1390, and does not, as plaintiffs seem to argue, invest law enforcement officers with sweeping, unrestrained discretion.

## IV.

■ The Ninth Amendment provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny

or disparage others retained by the people." U.S. Const. amend. IX. Plaintiff Bill Orr, appearing pro se, argues the right to circulate initiative and referendum petitions is an unenumerated right protected by the Ninth Amendment. He implicitly argues it is incorporated in the Fourteenth Amendment. He points to no controlling authority in support. His argument is unpersuasive.

## V.

The general assembly attached a safety clause to S.B. 93–135. Plaintiffs moved at pretrial to preliminarily enjoin S.B. 93–135, arguing the general assembly unconstitutionally attached the safety clause. The court denied the motion. We affirmed, explaining in part as follows: "Although the attachment of the safety clause to SB 93–135 precludes a referendum challenge, it does not unconstitutionally restrict plaintiffs' access to the ballot. Plaintiffs remain free, under the initiative power reserved to the people by the Colorado Constitution, art. V, § 1(2), to propose any measure by petition." *American Constitutional Law Foundation v. Meyer*, 33 F.3d at 63. We remain convinced, for substantially the same reasons stated in our earlier order, that plaintiffs' arguments against the constitutionality of the safety clause are without merit.

AFFIRMED IN PART and REVERSED IN PART.