Sondra BECTON, Plaintiff,

v.

Chris THOMAS, individually and, in his capacity as Probate Court Clerk of Shelby County, Tennessee and Shelby County Government, Defendant.

No. 98–2977 DV.

United States District Court,
W.D. Tennessee,
Western Division.

April 22, 1999.

Mark A. Allen, Allen Godwin Morris Laurenzi & Bloomfield, Memphis, TN, for Sondra Becton, plaintiff.

Alan G. Crone, Wilder Crone Johnston Mason & Goodwin, Memphis, TN, for Chris Thomas, Individually and in his capacity as Probate Court Clerk of Shelby County, Tennessee, Shelby County Government, defendants.

## ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION

DONALD, District Judge.

■ Before this court is Plaintiff's, Sondra Becton, motion for a preliminary injunction enjoining Defendants, Chris Thomas ("Defendant"), individually and in his capacity as Probate Court Clerk of Shelby County, and Shelby County Government, from demoting or otherwise disciplining Plaintiff pending further orders from the court. At a hearing on this motion, Plaintiff alternatively requested a preliminary injunction enjoining Defendant from hiring a permanent replacement for Plaintiff's former position as Chief Deputy Clerk. As grounds for this motion, Plaintiff avers that Defendant demoted her in retaliation for: 1) running against Defendant in the 1994 election as a candidate for the position of Probate Court Clerk of Shelby County and 2) filing charges of racial discrimination against Defendant with the Shelby County Office of Equal Opportunity and the United States Equal Employment Opportunity Commission. Plaintiff contends that such actions violated her rights under the First Amendment[1], the Equal Protection Clause of the Fourteenth Amendment, Substantive Due Process under the Fourteenth Amendment and Title VII of the Civil Rights Act of 1964.

At the hearing on this motion, Defendant contended that the requested preliminary injunction should not be granted because Plaintiff had failed to satisfy the prerequisites for a preliminary injunction. Defendant first asserted that preliminary injunctions are only appropriate to preserve the status quo and to prohibit some future harm. Defendant argued that a preliminary injunction could not be issued by this court where Plaintiff has already suffered the alleged harm and is seeking to undo that harm. Moreover, Defendant also asserted that Plaintiff could not show irreparable harm because adequate legal remedies existed to wit, money damages, to make Plaintiff whole. Defendant argued Plaintiff's ability to obtain back pay, front pay, damages and reinstatement from either the Shelby County Civil Service Merit Board or this court as support for its contention that injunctive relief is unwarranted. Although Defendant con-

---

1. Under the jurisprudence of the United States Supreme Court, the First Amendment is incorporated into the Due Process Clause of the Fourteenth Amendment and is therefore applicable to the states. *See Thornhill v. Alabama,* 310 U.S. 88, 95, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); *Duncan v. Louisiana,* 391 U.S. 145, 147–48, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

ceded that First Amendment violations could warrant injunctive relief, he contended that the mere act of running for political office is not protected by the First Amendment and therefore cannot serve as the basis for injunctive relief.

At the conclusion of the hearing, the court orally enjoined Defendant from appointing or hiring anyone to fill the position from which Plaintiff had been demoted. The court granted this injunction as a provisional order to remain effective until the court had reviewed the evidentiary submissions filed by Defendant on the morning of the hearing. Having reviewed all of Defendant's submissions regarding the propriety of granting Plaintiff's request for a preliminary injunction, the court is now prepared to rule on Plaintiff's motion.

For the following reasons, the court grants a limited injunction enjoining Defendant from appointing or hiring a permanent replacement for Plaintiff's former position of Chief Deputy Clerk or abolishing the position pending resolution of this case on the merits. The court declines to require Defendant to reinstate Plaintiff to her former position of Chief Deputy Clerk. Because it appears from the preliminary proof that Plaintiff may be able to show excessive documentation to her file, the court orders that the personnel file of Plaintiff be sealed and that all further entries be filed with this court under seal.

## I. FINDINGS OF FACT

1. Plaintiff, a black female, began her employment with Shelby County Probate Court in July 1973 as a minute clerk. Plaintiff worked as minute clerk for one and a half years and, in that capacity, typed minutes of probate court proceedings and recorded wills, settlements and inventories.

2. Bobby Dunavant ("Dunavant") was the Probate Court Clerk at the time of Plaintiff's hiring and for most of Plaintiff's career with the Clerk's office.

3. In time, Plaintiff was promoted to the position of deputy clerk. As a deputy clerk, Plaintiff was responsible for assisting attorneys at the counter of the Clerk's office, making filings and entering work on the court's docket.

4. After serving as a principal clerk, Plaintiff was promoted to Chief Deputy Clerk on March 1, 1990, also referred to as Supervisor B, a position she held until her demotion on March 16, 1999. Under Dunavant, the Chief Deputy Clerk served as an administrative assistant to the Probate Court Clerk and was responsible for overseeing the technical duties of the Clerk's office. Plaintiff was required to perform minimal supervisory duties, except when Dunavant was absent.

5. While Dunavant was Probate Court Clerk, he carried out most of the office's supervisory duties, conducted all job evaluations, and did most of the training.

6. Dunavant managed the office by staying intimately involved in the day-to-day workings of the office. He conducted several conferences with employees and placed his own office in the middle of the Clerk's office.

7. As Probate Court Clerk, Dunavant conducted annual performance evaluations of his employees.

8. Shelby County uses the following rating system in its employee performance evaluation system: 4=Superior, 3=Competent & Effective, 2=Needs Improvement, 1=Unsatisfactory.

9. Plaintiff received an overall performance rating of 3.3 on June 14, 1991.

10. Plaintiff received an overall performance rating of 3.2 on June 15, 1992.

11. Plaintiff received an overall performance rating of 3.1 on September 13, 1993.

12. Plaintiff received an overall performance rating of 3.0 on June 21, 1994.

13. During Plaintiff's tenure as an employee under Dunavant's supervision, she

never received an overall performance rating of less than competent from Dunavant.

14. Dunavant retired as Probate Court Clerk in 1994.

15. In February of 1994, Plaintiff began her political campaign for the office of Shelby County Probate Clerk. Plaintiff received the Democratic Party's nomination and ran as the Democratic nominee.

16. One of Plaintiff's opponents in the 1994 election was Defendant, a white male and the Republican nominee for Shelby County Probate Court Clerk.

17. In the August 1994 election, Defendant won the position as the new Shelby County Probate Court Clerk. He formally took office in September of 1994.

18. Within the first week of his arrival in the Probate Court Clerk's office, Defendant conducted short meetings with every employee, including Plaintiff.

19. During his initial meeting with Plaintiff, Defendant introduced himself and told Plaintiff that he would not be a "hands-on" clerk. Plaintiff testified that at this meeting, she informed Defendant of her desire to continue with the Probate Court Clerk's office and be a part of the team.

20. On October 31, 1994, Defendant had a discussion with Plaintiff in which he informed her of his attempts to have her transferred to another position of comparable pay.

21. Some time within the first sixty days of Defendant's assumption of duties as Probate Court Clerk, Defendant had a discussion with Plaintiff about documenting her file. There is a factual dispute as to the content of that conversation. Plaintiff testified that Defendant said he could get rid of her and implied that he would do so by documenting her personnel file. On the other hand, Defendant testified that he told all employees that he would document their file for any performance deficiencies and simply communicated those intentions to Plaintiff.

22. Plaintiff received an overall performance rating of 2.14 on March 1, 1995.

23. Plaintiff received an overall performance rating of 2.86 on June 19, 1995.

24. Plaintiff received an overall performance rating of 3.10 on November 8, 1995.

25. Plaintiff received an overall performance rating of 3.3 on February 13, 1996.

26. Plaintiff received an overall performance rating of 3.0 on September 13, 1996.

27. Plaintiff received an overall performance rating of 3.2 on June 23, 1997.

28. On July, 25, 1997, Plaintiff filed a charge of discrimination based on race with the Shelby County Office of Equal Opportunity based on allegations that Defendant had discriminated against her by constantly "criticizing and harassing" her.

29. In March 1998, Plaintiff received a performance evaluation describing her as "Needs Improvement." At the time of this evaluation, Plaintiff's charge of racial discrimination with the County Office of Equal Opportunity had not been resolved.

30. On April 13, 1998, Plaintiff arrived at work to find that a broom had been placed in her chair. Plaintiff was upset by this incident. She reported the incident to Defendant's assistant and asked that it be investigated. Plaintiff states that nothing was done, and the office generally thought the incident was amusing. Plaintiff never directly reported the incident to Defendant.

31. On May 29, 1998, Plaintiff filed charges of racial discrimination and retaliation with the U.S. Equal Employment Opportunity Commission.

32. On August 25, 1998, Defendant suspended Plaintiff for one week for acts of incompetency and intentional failure to carry out instructions. Plaintiff testified that she had been suspended for her) failure to properly process an appeal, 2) failure to complete accountings, 3) failure to create a system to track accountings, and 4) failure to write a personnel policy manual.

33. In September 1998, Plaintiff was rated as "Marginally Meets Standards" in the areas of day-to-day supervision, public relations and record-keeping and reports.

33. On October 14, 1998, Plaintiff received formal discipline in the form of an oral reprimand for unsatisfactory work.

34. From October 15, 1998 through January 18, 1999, Plaintiff was absent from work due to medical complications.

35. Plaintiff filed this lawsuit against the Defendant individually and in his capacity as Probate Court Clerk of Shelby County on November 6, 1998.

36. On December 22, 1998, Plaintiff received a Notice of Proposed Major Discipline on the basis of 1) absence without authorized leave, 2) acts of incompetency, 3) intentional failure to carry out instructions, and 4) unsuccessful completion of performance probation.

37. On January 19, 1999, Defendant issued a Decision Regarding Proposed Major Discipline. In that decision, Defendant determined that Plaintiff would receive no discipline on the charge of unauthorized leave because he had received her medical records by subpoena. Defendant indicated that he had decided not to impose disciplinary action at that time on the charges of acts of incompetency and intentional failure to carry out instructions. Defendant also extended Plaintiff's probationary period to March 19, 1999.

38. On March 5, 1999, Plaintiff received a Notice of Proposed Major Discipline from Defendant. The charges contained in this notice included acts of incompetency, intentional failure to carry out instructions, and unsuccessful completion of performance probation.

39. On March 16, 1999, Defendant issued a Decision Regarding Proposed Major Dis-

cipline. In that decision, Defendant demoted Plaintiff from Supervisor B to Principal Court Clerk, effective March 22, 1999. With this demotion, Plaintiff's annual salary was reduced by approximately $8,000.

40. Shelby County uses performance evaluations as a mechanism to improve employee performance and to bring consistency in managerial standards.

41. In Shelby County's system of performance evaluations, supervisors are held to a higher standard of performance than that used for line employees.

## II. CONCLUSIONS OF LAW

■■ The preliminary injunction is "an extraordinary and drastic remedy" which should be granted with great caution. *See Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997). When faced with a motion for a preliminary injunction, a district court must consider four factors: 1) the plaintiff's likelihood of success on the merits; 2) whether the plaintiff could suffer irreparable harm without the injunction; 3) whether granting the injunction will cause substantial harm to others; and 4) the impact of the injunction on the public interest. *See Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.1998) (citing *Golden v. Kelsey–Hayes Co.*, 73 F.3d 648, 653 (6th Cir.1996)). These factors are not prerequisites that must be satisfied before a court can issue a preliminary injunction. *Performance Unlimited Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir.1995). Rather, the district court should balance all four factors in determining whether to grant or deny the injunction. *Id.* Under Rule 52 of the Federal Rules of Civil Procedure[2], "a district court is required to make specific findings con-

---

**2.** Rule 52 states in relevant part:

In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58; and in granting or refusing interlocutory injunctions, the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action.

FED.R.CIV.P. 52(a).

cerning each of the four factors." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir.1985). Accordingly, the court will first discuss the factual findings and law relevant to each of the factors and then conduct a balancing of those factors in its conclusion as to the propriety of a preliminary injunction in this case.

■ However, before proceeding any further, the court needs to address a threshold argument made by Defendant both in his written response to Plaintiff's motion for preliminary injunction and at the subsequent hearing on this motion. Defendant contends that the relief requested by Plaintiff is beyond the scope of relief which a preliminary injunction can provide. In support of this contention, Defendant begins with the assumption that a preliminary injunction can only be granted when the district court is attempting to preserve the status quo. In other words, an injunction should be issued only when the court wishes to preserve the relationship of the parties as they are situated at the time the request for injunctive relief is made. Defendant argues that Plaintiff's request for relief comes too late because Plaintiff has already been demoted to the position of Principal Clerk. Defendant contends that if this court were to grant any injunctive relief, it would have to issue a preliminary injunction, which by its very nature, would preserve the status quo and keep Plaintiff in her demoted position with the Probate Court Clerk's office. Because Plaintiff is requesting the court to change the status quo by reinstating Plaintiff to her former position as Chief Deputy Clerk, Defendant argues that he cannot be mandated through an injunction to give Plaintiff the relief she requests.

The flaw in Defendant's argument lies in his assumed premise. While it is true that federal courts have often described the purpose of preliminary injunctions as preserving the status quo, *see, e.g. CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618, 620 (1st Cir.1995); *Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 143 F.3d 688, 692 (2nd Cir.1998), *cert. granted* —— U.S. ——, 119 S.Ct. 537, 142 L.Ed.2d 447 (1998); *Anderson v. Davila*, 125 F.3d 148, 156 (3rd Cir.1997); *Meiselman v. Paramount Film Distributing Corp.*, 180 F.2d 94, 97 (4th Cir.1950), this description should not be mistaken for a legal limitation to the scope of a preliminary injunction. This erroneous view of preliminary injunctions was addressed by the United States Court of Appeals for the Sixth Circuit in *Stenberg v. Cheker Oil Co.*, 573 F.2d 921 (6th Cir.1978) which explained:

> It must not be thought, however, that there is any particular magic in the phrase "status quo." The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. If [sic] often happens that this purpose is furthered by preservation of the status quo, *but not always.* If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either *by returning to the last uncontested status quo between the parties,* by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury.

*Stenberg* at 925 (emphasis added) (citations omitted).

Thus, if the court finds that a preliminary injunction is appropriate in this case, there is nothing about the nature of such a remedy that would preclude the court from ordering Plaintiff reinstated to her former position, if doing so would preserve the court's ability to issue a meaningful decision.

*A. LIKELIHOOD OF SUCCESS ON THE MERITS*

■ Plaintiff must do more than show the mere possibility of success in her substantive claims to establish a likelihood of success on the merits. *Six Clinics Hold-*

*ing Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 402 (6th Cir.1997). On the other hand, Plaintiff does not have to convince the court that she will prevail or present such an overwhelming flood of favorable evidence that the court cannot help but conclude that she will win on the merits. *See University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) (stating that "[a] party is not required to prove his case in full at a preliminary-injunction hearing"). Rather, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits [which are] so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.* This inquiry requires the court to examine the substantive law governing Plaintiff's claims.

### 1. First Amendment and Substantive Due Process Claims

Plaintiff alleges that Defendant has violated her First Amendment rights by: 1) seeking to transfer her from a job she had held for twenty-one years, 2) discriminating against her by subjecting her to excessive documentation of her job performance, 3) giving her negative performance evaluations, and 4) demoting her from Chief Deputy Clerk to Principal Clerk. Plaintiff contends that Defendant subjected her to these harms as a result of her political candidacy as the Democratic nominee for Shelby County Probate Clerk. More specifically, Plaintiff argues that Defendant harassed and demoted her in retaliation for Plaintiff's political candidacy against him and because of her affiliation with the Democratic Party.

#### a. Right to Run for Office

■ The United States Supreme Court has never recognized an individual's right to run for political office as a "fundamental right." *See Bullock v. Carter,* 405 U.S. 134, 142–43, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (stating that the Court "has not heretofore attached such fundamental status to candidacy as to invoke a rigorous

standard of review"). The Court made this statement in the context of a legal challenge to the primary election filing fee system used by the State of Texas. Under this system, primary candidates for most district, county, and precinct offices were compelled to bear the cost of holding the primaries. This cost was apportioned by estimating the aggregate cost of the primary and then allocating that cost among all candidates. Several individuals, who were denied places on the Democratic Party's primary ballots because they were unable to pay the filing fees, filed suit alleging that the fee system was unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In its determination of what level of judicial scrutiny to apply to the Texas law, the Court noted that there was no fundamental right to political candidacy and that any restriction upon that right would not be subject to a stringent standard of review. *See Bullock* at 142–43, 92 S.Ct. 849. On the other hand, the Court did recognize the right to vote as fundamental and therefore deserving of a close judicial scrutiny in the context of a Equal Protection claim. *Id.* at 142, 92 S.Ct. 849. Although the Court did not find a fundamental right to political candidacy, it did concede that there was not always a clear delineation between the rights of voters and those of candidates. *Id.* at 143, 92 S.Ct. 849. The Court determined that the level of judicial scrutiny applicable to these hybrid cases varied with the extent of the restrictions' impact upon voting rights. *Id.* at 143–44, 92 S.Ct. 849. In the case before it, the *Bullock* Court found that the restrictions on political candidacy should be subjected to close scrutiny because they had a strong impact on the exercise of the franchise. *Id.* at 144, 92 S.Ct. 849.

The Supreme Court addressed the constitutional protection afforded an individual's right to political candidacy again in *Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982). The

state of Texas was involved again in *Clements*. This time, public officials, Texas citizens, and registered voters challenged a provision of the Texas Constitution which required public officials to resign from their current office if they became candidates for another political office at a time when the unexpired term of their current office exceeded one year. The plaintiffs argued that such restrictions on officeholding violated the First Amendment and the Equal Protection Clause. In addressing the level of scrutiny appropriate for judicial review of the provision in question, the Court noted that "[f]ar from recognizing candidacy as a 'fundamental right,' we have held that the existence of barriers to a candidate's access to the ballot 'does not of itself compel close scrutiny.'" *Clements* at 963, 102 S.Ct. 2836. However, the Court recognized, as it did in *Bullock*, that restrictions on candidacy also have to be evaluated in terms of their impact on voting rights. *Id.* The Court characterized the case before it and *Bullock* as "ballot access cases" and identified the proper inquiry as "whether the challenged restriction unfairly or unnecessarily burdens the 'availability of political opportunity.'" *Id.* at 964, 102 S.Ct. 2836.

Some federal courts have relied upon the language of *Bullock* and *Clements* for the proposition that the First Amendment does not confer upon an individual a fundamental right to seek political office. *See e.g., American Constitutional Law Foundation, Inc. v. Meyer*, 120 F.3d 1092, 1101 (10th Cir.1997); *NAACP, Los Angeles Branch v. Jones*, 131 F.3d 1317, 1324 (9th Cir.1997), *cert. denied,* ―― U.S. ――, 119 S.Ct. 48, 142 L.Ed.2d 37 (1998); *Brazil–Breashears v. Bilandic*, 53 F.3d 789, 792 (7th Cir.1995). In *Meyer* and *Jones,* these determinations were made in the context of challenges to state laws regulating elections and political campaigning. The *Brazil–Breashears* case featured a state court employee's First and Fourteenth Amendment challenges to an employment policy prohibiting state court employees from becoming political candidates and engaging in other political activities.

The Sixth Circuit addressed the question of whether the right to run for political office is a fundamental right in *Carver v. Dennis*, 104 F.3d 847 (6th Cir.1997). In *Carver,* the plaintiff was a deputy clerk who was laid off and then dismissed from her position after she decided to run for county clerk against the incumbent candidate, who was also the plaintiff's supervisor at the time she announced her candidacy. The plaintiff brought suit against her superior, the county clerk, alleging that he had violated her First Amendment rights by terminating her simply because she had chosen to run against him for the position of county clerk. There was no dispute as to what motivated the defendant's decision to terminate the plaintiff's employment. The defendant conceded that the plaintiff was dismissed only because of her candidacy for the office of county clerk.

After noting that the Supreme Court had not recognized a fundamental right to political candidacy, the Sixth Circuit emphasized that the factual record of the case before it indicated that the "basis for her [plaintiff's] discharge was solely the fact that she was trying to take the job of her employer." *Carver* at 852. The court then identified the relevant case law as that concerning "the candidacy of an employee who runs for the elective office of his boss." *Id.* After reviewing that case law and making comparisons to the case before it, the court concluded that the plaintiff's claim was nothing more than an allegation that her boss fired her because she was attempting to take his job. *Id.* The court concluded that "[t]he First Amendment does not require that an official in Dennis's situation nourish the viper in the nest." *Id.*

Although it is clear that a fundamental First Amendment right to run for office has not been recognized by either the Supreme Court or this Circuit, that fact alone does not dispense with the question of whether any First Amendment interests

are implicated when an employer retaliates against an employee simply because that employee ran for public office. This court first questions the propriety of using the language of *Bullock* and *Clements* to govern allegations of retaliation for the exercise of the right to run for political office. Both *Bullock* and *Clements* were, in the words of the Court, ballot access cases. In those cases, the state had enacted generally applicable laws which the plaintiffs contended violated their constitutional rights by restricting the pool of eligible candidates for elective offices. It was in the context of these generally applicable state laws regulating elections and political candidates that the Court chose not to recognize a fundamental right to political candidacy. The factual circumstances addressed by the Court in these cases were drastically different from those found in the case at hand. In *Bullock* and *Clements*, the state had not enacted candidacy restrictions only applicable to a specified individual or group of individuals. The state had not enacted *ex post facto* laws punishing a specified individual or group of individuals for exercising their right to run for political office. In both *Bullock* and *Clements*, the plaintiffs argued that the effect of the generally applicable laws was to discriminate against certain classes of people in contravention of the Equal Protection Clause and, in *Clements*, the First Amendment. In contrast to the facts of these cases, the plaintiff in the instant case alleges that a public official retaliated against her for exercising her right to seek political office. Plaintiff is not challenging a general office policy that prohibits Probate Court employees from seeking political office or imposes such severe prerequisites to running for office that it has a discriminatory effect on certain employees. Plaintiff is not challenging a generally applicable statute or regulation. Plaintiff is challenging what she perceives as unlawful actions taken against her because she ran against Defendant in the 1994 election.

Moreover, a determination that the right to run for office is not fundamental does not mean that such a right is not deserving of any constitutional protection. In its most recent opinion addressing the right to seek public office, the Seventh Circuit made this observation as well. *See Brazil-Breashears* at 792. After stating that the right to candidacy is not fundamental, the court noted: "[h]owever, to say that the right to candidacy is not fundamental is not to say that a rational basis analysis applies." *Id.* With that statement, the Seventh Circuit indicated that, in its view, the Constitution does protect an individual's right to seek public office and that the level of scrutiny applicable lies somewhere between the strict scrutiny used when fundamental rights are infringed and the highly deferential "rational basis" test used when nonfundamental liberties are denied. This court agrees with the Seventh Circuit's conclusion that the Constitution affords some protection to an individual's right to seek public office.

Contrary to Defendant's contention, the court sees nothing in the Sixth Circuit's *Carver* opinion which definitively forecloses constitutional protection for the right to run for office. Defendant relies upon *Carver* as support for its contention that the First Amendment provides no protection for the right to run for political office. However, careful analysis of the facts and holding of *Carver* demonstrates that Defendant's characterization of the court's decision is too sweeping in scope. There is no question that the court found no fundamental right to political candidacy. Nevertheless, the Sixth Circuit clearly had no intention of using the *Carver* case to resolve the broader question of whether the First Amendment ever provides any protection for an individual's right to run for political office. In describing the issue before it in *Carver*, the court said:

[s]tated narrowly, the issue before us is whether Carver, a deputy county clerk who was an at-will employee in a two-person office—the other person being

the county clerk herself—had a First Amendment right to run against the incumbent clerk in the next election and still retain her job.

*Carver* at 849.

Where the court expressly limited its discussion of the right to run for political office to such a narrowly defined issue, this court is reluctant to construe the court's opinion as providing a definitive answer to the question of whether the First Amendment prohibits a county clerk from retaliating against a public employee because she ran against him for political office.

This reluctance is further supported by a subsequent Sixth Circuit opinion commenting on an individual's right to seek public office. In *Miller v. Lorain County Bd. of Elections*, 141 F.3d 252 (6th Cir. 1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 278, 142 L.Ed.2d 230 (1998), the Sixth Circuit reviewed First and Fourteenth Amendment challenges to a state ballot access scheme. In assessing whether procedural due process should apply to an election board's invalidation of the plaintiff's nominating signatures, the court stated, "whether an individual has a constitutionally protected interest in becoming a candidate for public office *is not clear.*" *Miller* at 260 (emphasis added). In the adjoining footnote to this statement, the Court explained:

> [i]t is difficult to define the contours of the right of candidacy. Given the integral relationship between candidacy and voters' right under the First Amendment, candidacy may involve some level of a protected property or liberty interest.

*Id.*

If, as Defendant contends, *Carver* stands for the proposition that there is no First Amendment protection for an individual's right to run for office, the answer to the question of whether an individual has a constitutionally protected interest in becoming a candidate is clear: no such protection exists for that interest. The Sixth Circuit's statements in *Miller* clearly indicate that *Carver* should not be construed as holding that the First Amendment never provides any protection for an individual's right to seek public office. Accordingly, this court concludes that the First Amendment does provide some protection to Plaintiff against retaliation for seeking political office.

■ Alternatively, Plaintiff's right to run for public office is constitutionally protected as a liberty interest under the Fourteenth Amendment's Due Process Clause. In *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), the Court described the liberty guaranteed by the Fourteenth Amendment as encompassing:

> the right of an individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

*Meyer* at 399, 43 S.Ct. 625.

Under the Fourteenth Amendment's Due Process Clause, these liberties cannot be interfered with by "legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect." *Id.* at 399–400, 43 S.Ct. 625, *see also County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 1716, 140 L.Ed.2d 1043 (1998) (stating that "[w]e have emphasized time and time again that '[t]he touchstone of due process is protection of the individual against arbitrary action of government'" (citation omitted)). This constitutional protection, commonly referred to as substantive due process, applies even though some of these rights, such as the liberty to engage in a common occupation of life, are not fundamental and deserving of a stringent standard of review. *See Conn v. Gabbert*, —— U.S. ——, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999) (stating that the due

process right to choose one's field of private employment is "subject to *reasonable* government regulation") (emphasis added). The freedom to run for political office is sufficiently akin to the freedoms listed in *Meyer* to qualify as a liberty interest protected by the Due Process Clause. American history has clearly demonstrated that a political career, no matter how short-lived, is one of this country's "common occupations of life." Furthermore, several federal courts have described the opportunity to run for office as a right or liberty entitled to some protection. *See Clements v. Fashing,* 457 U.S. 957, 971, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (referring to "appellees' First Amendment interests in candidacy")[3]; *Flinn v. Gordon,* 775 F.2d 1551, 1554 (11th Cir.1985) (referring to "a constitutional right to run for office"); *Mancuso v. Taft,* 476 F.2d 187, 193 (1st Cir.1973) (referring to "the right to become a candidate for public office"); *Reed v. Town of Babylon,* 914 F.Supp. 843, 892 (E.D.N.Y.1996) (referring to the "first amendment's protection of the freedom of association and of the rights to run for office"). Since the freedom or opportunity to run for political office is a liberty interest under the Fourteenth Amendment's Due Process Clause, a state cannot deny or infringe that liberty interest unless it can offer a reasonable justification or rational basis for doing so.

■ In the case at hand, Plaintiff received the Democratic nomination for Probate Court Clerk of Shelby County and ran against Defendant, the Republican nominee for the same post in the 1994 election. Plaintiff lost the election and returned to her position as Chief Deputy Clerk. In September of 1994, Defendant assumed his position as the new Probate Court Clerk of Shelby County. At the hearing on this motion for preliminary injunction, Plaintiff testified that she was told in October 1994 of Defendant's attempts to have her transferred out of the Probate Clerk's office. Plaintiff further testified that, during this conversation, Defendant said he had attempted to transfer Plaintiff because he did not think he and Plaintiff would have a good working relationship. Plaintiff stated that Defendant did not provide her with any specific reason or identify any particular deficiency in her job performance which prompted him to seek a transfer for her. Since Defendant had not been Probate Clerk for even a month when he attempted to transfer Plaintiff, Plaintiff testified that, in her opinion, Defendant simply wanted to get rid of her. Plaintiff also testified that during Defendant's first month as Probate Court Clerk, he had a discussion with her in which Defendant indicated that he could get rid of Plaintiff and that he would begin documenting her employment file. At a trial on the merits, Plaintiff will bear the burden of proof as to these matters.

Irrespective of whether Plaintiff's freedom to run for office is characterized as a First Amendment right or a liberty interest protected under the Due Process Clause, the court finds that Plaintiff has "raised questions going to the merits [which are] so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation" and thus has shown a substantial likelihood of success on the merits. *See Cafcomp Systems, Inc.* at 402. There is no dispute over whether Defendant sought to transfer Plaintiff early in his tenure as Probate Court Clerk. During his testimony, Defendant admitted that he had initiated a conversation with the head of personnel for Shelby County and inquired about the availability of positions into which Plaintiff could transfer. The timing of Defendant's attempts to transfer Plaintiff raises serious questions as to the

---

**3.** Although this description was offered by the Court in the context of determining that a state statute's infringement upon the plaintiffs' interests in candidacy was too insignificant to warrant a finding that the statute violated traditional equal protection principles, this court finds it telling that the Court recognized an interest in candidacy sufficiently strong to be subjected to any equal protection analysis.

legitimacy of his reasons for doing so. Defendant's attempt to transfer Plaintiff did not occur after a consistent and prolonged pattern of conflict between Defendant and Plaintiff. Quite the contrary, less than thirty days had lapsed when Defendant began exploring the possibility of transferring Plaintiff. Such a short time period seems insufficient to make a determination that Plaintiff's presence in the office of the Probate Court would be so disruptive as to warrant her transfer from the office. Moreover, Defendant testified that his relationship with Plaintiff was initially civil. Where there was little, if any, evidence of early conflict between Plaintiff and Defendant, a more plausible explanation of Defendant's attempts to transfer Plaintiff would posit that the desire to transfer was related in some way to Plaintiff's political candidacy against Defendant.

This is not to say that Defendant intended to harm Plaintiff or to retaliate against her with a malevolent motive. Based on the record now before the court, it would be premature to reach an irrevocable conclusion as to the precise nature of Defendant's motives. However, even if Defendant had been sincerely convinced that working for a former political opponent would create an uncomfortable work environment for Plaintiff, her liberty interest in running for political office would have been no less infringed, if the transfer had occurred, simply because the adverse employment decision was motivated by benign purposes. Every individual should be given the opportunity to determine for herself whether working for a former political opponent will be so intolerable that a transfer would be desirable. To allow state or county employers to unilaterally condition job benefits and conditions upon a public employee's completed candidacy in an election would infringe upon Plaintiff's constitutionally protected liberty interest in running for political office.

 Nevertheless, all infringements upon liberty are not constitutional violations. The Due Process Clause is violated only if governmental actors are unable to articulate a rational basis for denying a liberty interest protected by the Fourteenth Amendment. Having found that Plaintiff has shown a substantial likelihood of success on the merits, the court turns to the question of whether a legitimate governmental objective exists to justify Defendant's infringement of Plaintiff's liberty to run for political office. This case does not present a scenario where Defendant can justify its actions on the grounds that Plaintiff was a policymaking employee and was exercising her discretion in a manner which thwarted the goals of the Republican Party. *See Elrod* at 367–68, 96 S.Ct. 2673. (recognizing a policymaker exception to the First Amendment prohibition against patronage dismissals and stating that "[n]onpolicymaking individuals usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party"). Plaintiff was clearly not in a "policymaking position" as defined in the Supreme Court's jurisprudence. *Id.* (defining a policymaking employee as one "with responsibilities that are not well defined or are of broad scope"). Nor can Defendant assert that the attempted transfer, the alleged harassment, or the recent demotion were necessary "to insure effective government and the efficiency of public employees." *Id.* at 364, 96 S.Ct. 2673. Furthermore, it is not rational to assume, without any evidence to support that assumption, that a losing candidate cannot function effectively and capably in an office where she has worked for twenty-one years because the new supervisor is her former political opponent. Finally, Defendant cannot contend that Plaintiff's candidacy was disruptive to the Probate Court Clerk's office because Defendant was not even employed by the office during the time of Plaintiff's candidacy. At that time, Defendant was a candidate seeking the office of Probate Court Clerk. Thus, even if Shelby County has a legitimate governmental interest in preventing co-employees from running against one another for political office, the

court fails to see how that interest would be served by demoting or discriminating against an employee on the grounds that she ran for political office *against a non-employee* well before the retaliatory actions began. In short, the court is unable to discern any rational and legitimate government interest that would cure this infringement upon Plaintiff's Fourteenth Amendment liberty interest in running for political office. Moreover, Defendant has not offered any such explanation or rationale. Absent a rational and legitimate government interest, retaliatory actions taken against a public employee because she ran for public office constitute an infringement on that employee's liberty interest as protected by the Fourteenth Amendment.

### b. Political Patronage

The seminal case on political patronage is *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In *Elrod*, the plaintiffs, all Republicans, had been non-civil-service employees of a sheriff's office and served under a Republican sheriff. In the next election, the Republican sheriff was defeated by the Democratic nominee. In accordance with the existing practice of political patronage, the new sheriff proceeded to discharge all but one of the Republican non-civil-service employees of the sheriff's office to enable him to hire employees approved by the Democratic Party.[4] These discharged employees brought a class action lawsuit on behalf of all non-civil-service employees who had been fired or threatened with dismissal because of their political affiliation with the Republican Party.

The Court began its analysis of *Elrod* by noting that the practice of patronage, the provision of political appointments, jobs, lucrative contracts and other public services on a partisan basis, was a well-established practice in American politics. *Elrod*

at 353–54, 96 S.Ct. 2673. The Court identified the legal problem of political patronage as the "restraint it places on freedoms of belief and association." *Id.* at 355, 96 S.Ct. 2673. The Court explained that partisan hiring and firing created a penalty for affiliation with the out-party and an incentive to support the in-party. *Id.* Such a system of rewards and punishments inevitably forces some individuals to act contrary to their beliefs and restricts their freedom of association. *Id.* at 355–56, 96 S.Ct. 2673. The Court also noted that political patronage hampers the "free functioning of the electoral process" by preventing support for competing political interests. *Id.* at 356, 96 S.Ct. 2673.

After discussing the effects of political patronage, the Court reaffirmed that "political belief and association constitute the core of those activities protected by the First Amendment." *Id.* Because the freedom to associate with the political party of one's choice is an integral part of every citizen's First and Fourteenth Amendment rights to "associate with others for the common advancement of political beliefs and ideas," the Court employed strict scrutiny as the appropriate level of judicial review. *Id.* at 357, 96 S.Ct. 2673. Under strict scrutiny, the challenged governmental action must "further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights." *Id.* at 363, 96 S.Ct. 2673.

*Elrod*'s prohibition against political patronage has been extended to apply to promotions, transfers, recalls and hiring decisions based on party affiliation. *See Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). In the case at hand, Plaintiff relies upon that extension to allege that Defendant violated her First and Fourteenth

---

**4.** The one plaintiff who had not been dismissed at the time of the lawsuit was still in imminent danger of termination because he

was a Republican and lacked the support of the Democratic Party.

Amendment rights by actively participating in, encouraging and allowing a continuing pattern of harassment and disciplinary action in part because she exercised her right to affiliate with a political party.

Defendant argued at the hearing that Plaintiff's complaint constitutes nothing more than an allegation that Defendant retaliated against Plaintiff because she ran against him in the election for Probate Court Clerk. Defendant contended that Plaintiff had not offered any evidence suggesting that he harassed or demoted Plaintiff because of her affiliation with the Democratic Party. As mentioned above, the Sixth Circuit has recognized a distinction between subjecting an employee to discriminatory treatment because of her political beliefs and subjecting the employee to the same treatment because of her candidacy against her superior. *See Carver* at 850. Under *Carver,* the right to hold and express political beliefs is fundamental while the right to run for public office has yet to be elevated to that status. *Carver* at 853. To the extent that a distinction between candidacy and political beliefs can be made in the context of this case, the court is inclined to agree with Defendant's contention. Plaintiff has not offered enough evidence to show a likelihood of success on the merits of her contention that the alleged harassment and demotion resulted from Defendant's personal animus against the Democratic Party or from his desire to share the spoils of victory with fellow Republicans. Having made this statement, the court is mindful that upon taking office, Plaintiff hired his former campaign manager for a management position in the Probate Clerk's office. It must be noted however, that such evidence is not required at the preliminary injunction stage. While Plaintiff has adduced evidence supporting her contention that Defendant retaliated against her for exercising her liberty to run for office, and while she has offered some evidence to support her claim of political patronage, she has not offered a sufficient quantum of evidence to prove political patronage. It may

be that Defendant retaliated against Plaintiff only because she exercised her right to run for office against him in the 1994 election and not because of her political affiliation as a Democrat. Although, as discussed above, the court does not deem such actions to be beyond the reach of the Constitution, it cannot classify this case as political patronage case under *Elrod* without more evidence of discrimination on the basis of party affiliation. Plaintiff deserves the opportunity to conduct the necessary discovery in support of this and all tenable claims.

2. Title VII Retaliation

■■ Title VII makes it unlawful for an employer to discriminate against an employee in retaliation for the filing of a charge of discrimination on the basis of race or initiating a lawsuit alleging a violation of Title VII. Title VII's prohibition against retaliation states in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... to discriminate against any individual ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a) (1994)

To establish a claim of retaliatory discharge under Title VII, Plaintiff must prove that 1) she engaged in activity protected by Title VII; 2) this exercise of her protected civil rights was known to defendant; 3) the defendant thereafter took an employment action adverse to her; and 4) there was a causal connection between the protected activity and the adverse employment action. *See Canitia v. Yellow Freight System, Inc.,* 903 F.2d 1064, 1066 (6th Cir.1990). Once Plaintiff has established a prima facie case of retaliation, Defendant assumes the burden of produc-

tion of evidence to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* After Defendant has satisfied his burden of production, Plaintiff, who retains the burden of persuasion throughout the litigation, must show that the proffered reason was not the true reason for Defendant's actions, but was mere pretext for discrimination. *Id.*

▪ Plaintiff claims that she was demoted from her position of Chief Deputy Clerk to Principal Court Clerk on March 16, 1999 in reprisal for her seeking relief under Title VII by filing an EEOC charge and this lawsuit. In support of her claim, Plaintiff avers that she filed this lawsuit on November 6, 1998, a status conference was held on December 21, 1998, and Defendant gave her a Notice of Proposed Major Discipline on December 22, 1998. Plaintiff appears to suggest that the timing of these events is indicative of a retaliatory intent on the part of Defendant. On January 19, 1999, Defendant issued a Decision Regarding Proposed Major Discipline in which he informed Plaintiff that she would not be disciplined for her three-month absence and that her performance probation period would be extended to March 19, 1999. Plaintiff received another Notice of Proposed Discipline on March 5, 1999. Plaintiff avers that the identified charges were almost identical to those raised in the January 19, 1999 Notice of Proposed Major Discipline. Plaintiff also places great emphasis on the fact that this notice was issued before the end of her performance probation. As a result of the March 5 Notice of Proposed Discipline, Plaintiff was demoted with an $8,000.00 reduction in annual salary.

Defendant contends that Plaintiff was demoted because of persistent deficiencies in her supervisory skills as Chief Deputy Clerk. Defendant argues that Plaintiff failed to follow instructions, did not provide proper training for her subordinate deputy clerks and created a negative working environment for her fellow employees. Defendant contends that demo-

tion came, not as a result of an isolated incident, but because of continuing performance problems about which Plaintiff had been repeatedly warned.

After hearing testimony and reviewing the record, the court concludes that Plaintiff has raised serious, factual questions of the true motives for Defendant's actions. A rational jury could find that Defendant's actions were a legitimate exercise of supervisory or business judgment. However, based on these same facts, a jury could also find that the real motive for Defendant's actions were discriminatory retaliation for the exercise of a constitutional or federally protected right. The testimony of Rhonda Harris regarding public statements by Defendant that the person who filed the EEOC charge would soon be gone, provides strong evidence of a retaliatory motive. Accordingly, the court finds that Plaintiff has shown a substantial likelihood of success on the merits as to the Title VII retaliation charge.

### B. IRREPARABLE HARM

▪ Because preliminary injunctions are extraordinary remedies, district courts only issue them when necessary. As the Sixth Circuit said in *Stenberg,* the preliminary injunction was created to "preserve the court's ability to render a meaningful decision on the merits." *Stenberg* at 925. Courts use the concept of irreparable harm to assess their capability of rendering meaningful decisions on the merits. A plaintiff's harm is not considered irreparable if "it is fully compensable by money damages." *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir.1992). Likewise, a plaintiff's harm is not irreparable if there is an adequate remedy at law. *CSX Transp. Inc. v. Tennessee State Bd. of Equalization,* 964 F.2d 548, 551 (6th Cir. 1992).

#### 1. Right to Run for Office

▪ When a plaintiff seeks a preliminary injunction based on an allegation that the defendant violated her First

Amendment rights, the plaintiff's ability to show a likelihood of success on the merits is often the determinative factor. *See Connection Distributing Co.* at 288. This result obtains because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod* at 373, 96 S.Ct. 2673. Having found that Plaintiff has demonstrated a substantial likelihood of success on her First Amendment claim, the court also finds that, based on prior discussion, Plaintiff has demonstrated irreparable harm will occur if relief is not granted.

The potential for irreparable harm is also created by the unique nature of Plaintiff's former position as Chief Deputy Clerk. Dunavant, former Probate County Clerk of Shelby County, testified that the Chief Deputy Clerk serves as an administrative assistant to the clerk and is responsible for ensuring that the duties of the Probate Clerk's office are properly performed. Plaintiff testified that the Chief Deputy Clerk is responsible for training other employees of the clerk's office. Such an important position is likely to be filled by Defendant before this case goes to trial in November, 1999, especially where he has already indicated that the clerk's office is understaffed. While the Probate Clerk's office has several deputy clerks, there is only one Chief Deputy Clerk. Accordingly, if Defendant hires a permanent replacement for Plaintiff, the court will be unable to provide her with the remedy of reinstatement if she prevails at trial on the merits of her lawsuit. Although the court could order reinstatement with the attendant cost of displacing Plaintiff's permanent replacement, doing so would not be in the best interests of the public, especially where a less disruptive option is available.

### 2. Title VII Retaliation Claim

Plaintiff avers that Defendant has engaged in a pattern and practice of retaliatory actions, including excessive negative documentation of her personnel file, undermining her authority, imposing excessive work tasks while failing to provide support, and imposing disproportionate performance requirements on Plaintiff. Plaintiff contends that these poor evaluations and negative comments are not factually supported and can cause Plaintiff irreparable harm in that Plaintiff's employment prospects for public office are eroded since Plaintiff's employment records would be subject to public review.

While the court is mindful that a number of factors must be weighed where one alleges any injury to reputation, the court finds that the harm Plaintiff asserts is a more particularized harm—future employment marketability.

The court is persuaded that Plaintiff has adequately demonstrated irreparable harm as to this issue. The court can fashion a remedy which mitigates the harm to Plaintiff while preserving the autonomy of Defendant to manage the resources of his office in fulfillment of his duties as Shelby County Probate Clerk.

### C. HARM TO OTHERS

As the court considers the potential harm to Defendant if Plaintiff's request for injunctive relief is granted, it is mindful of the Supreme Court's statement in *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) that "[t]he federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." *Bishop* at 349, 96 S.Ct. 2074. In assessing the potential harm to Defendant and his office, the court will assume that Defendant's asserted reasons for demoting Plaintiff are true. Based on this assumption, if the court were to grant Plaintiff's request for an injunction reinstating her to her former position, it would disrupt the effective working of the Probate Court Clerk's office by forcing the court employees to work under a supervisor whom Defendant believes has demonstrated consistent inadequacies in her supervisory skills. Moreover, Defendant has submitted evidence that some of Plaintiff's former subordinates also were dissatisfied with her supervision. Reinstating Plaintiff to her

former position would undermine Defendant's managerial authority by vetoing his exercise of discretion and has the potential of lowering the morale of the Clerk's office. The court declines to substitute its judgment for that of Defendant.

Nonetheless, the court must vindicate federal law. If Plaintiff prevails on the merits of her lawsuit and reinstatement is ordered, the court must be in a position to return her to the status quo ante. To that end, the court hereby enjoins Defendant from permanently filling the position of Chief Deputy Clerk or from eliminating the position without an express order of this court. This order in no way limits Defendant's ability to achieve the statutory and functional duties of the Office of Probate Clerk through the use of interim personnel and short-term assignments.

### D. PUBLIC INTEREST

■■■ The public certainly has an interest in preventing any further erosion of Plaintiff's First Amendment right to run for office. Similarly, it is in the public interest to ensure that public employees are not subjected to impermissible discrimination or retaliated against for the exercise of their constitutional or federally protected rights. As the Sixth Circuit said in *Connection Distributing Co.,* "it is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distributing Co.* at 288 (quoting *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir.1994)). On the other hand, the public also has an interest in the efficient and effective operation of the Probate Court Clerk's office. Moreover, if, as Defendant contends, Plaintiff is deficient in supervisory skills, reinstating her would force the public to pay a supervisor's salary to an employee who is not doing the work of a supervisor. Accordingly, the relief set forth herein is in the public interest.

### III. CONCLUSION

Based on the foregoing, Plaintiff's motion for preliminary injunction is **GRANT-ED** in part and **DENIED** in part. The court finds that Plaintiff is entitled to injunctive relief based on her strong First Amendment and retaliation showing. Accordingly, the court hereby enjoins Defendant from replacing Plaintiff as Chief Deputy Clerk until the issues in this lawsuit are resolved. Defendant is further enjoined from eliminating or abolishing the position of Chief Deputy Clerk/Supervisor B until the issues in this lawsuit are resolved. The court further orders Defendant to seal Plaintiff's personnel file and to file all additional performance evaluations with this court under seal. Defendant is not enjoined from conducting performance evaluations or making entries in Plaintiff's personnel record. Defendant may transmit the necessary information to county personnel for their accounting purposes, but it must then be sealed.

Nothing in this opinion should be construed as a final decision on the merits of this case. *See Camenisch* at 395, 101 S.Ct. 1830 (stating "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits"). The court's findings and inferences drawn from those findings were made in the narrow context of Plaintiff's motion for preliminary injunction and on the basis of the evidence heretofore presented to the court.

### IV. INJUNCTION

Defendants, Chris Thomas individually and in his capacity as the Shelby County Probate Court Clerk and Shelby County Government, are hereby enjoined and ordered to refrain from:

1. Permanently replacing Sondra Becton as Chief Deputy Clerk/Supervisor B.

2. Permanently filling the position of Chief Deputy Clerk/Supervisor B.

3. Abolishing, eliminating or otherwise eviscerating the position and duties of Chief Deputy Clerk/Supervisor B.

4. Terminating Sondra Becton's employment without an express order of this court.

5. Making the personnel records of Sondra Becton public without an express order of this court.

6. Retaliating against Sondra Becton in any manner for the exercise of any constitutional or federally protected right.

Defendants are further ordered to seal the personnel records of Sondra Becton and to file all future personnel entries under seal with this court.

The parties in consultation with the Shelby County Personnel Office are to draft and submit to this court within 10 days a document setting forth Defendants' proposed method for compliance with the court's sealing requirement. Finally, Plaintiff's motion for an order requiring immediate reinstatement is denied for the reasons set forth in this order.

**IT IS SO ORDERED.**